UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VANESSA TADEMY,

        Plaintiff,                                     No. 18-13835

v.                                                 District Judge Terrence G. Berg
                                                    Magistrate Judge R. Steven Whalen

FORD MOTOR COMPANY,

        Defendant.

_____/

**REPORT AND RECOMMENDATION**

On December 11, 2018, Plaintiff Vanessa Tademy filed a *pro se* civil complaint under the Americans with Disabilities Act ("ADA") and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"). Before the Court is Defendant Ford Motor Company's ("Ford's") motion for summary judgment [ECF No. 18], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that the motion be GRANTED.

**I.    FACTS**

In her complaint, Plaintiff states that she began her employment with Ford on approximately May 2, 2016. *Complaint*, ECF No. 1, PageID.2, ¶ 7. She alleges that in early August of 2017, she complained to management, through her union, that she was being harassed and bullied by other employees and managers, who called her "crazy" and "stupid," and made statements to the effect that "it won't be long before she goes off." *Id.*, PageID.3, ¶ 10. She states that on or about August 10, 2018 [sic 2017],[1] Ford

---

[1] The 2018 date appears to be a typographical error, since Plaintiff was terminated in February of 2018. It appears that Plaintiff instead is referring to the events of August

-1-

suspended her pending an investigation regarding a text message she allegedly sent to a co-worker. *Id*. ¶ 12. Five days later, on August 15, 2018 [sic 2017] she was transferred to a different department. *Id*. ¶ 13.

Plaintiff alleges that she filed a union grievance asserting that she had been wrongfully suspended after complaining of harassment and discrimination. Around January 4, 2018, Jimmy Williams, a Ford supervisor told her to report to Labor Relations. When she did so, Ryan Hernandez, a Labor Relations representative, told her that co-workers had complained that the Plaintiff made their work environment hostile, and Hernandez told her she was suspended pending investigation. *Id*. ¶¶ 14-17. Although Plaintiff told Hernadez that the allegations against her were false, Hernandez told her that she had to report to a health clinic for a fitness for duty examination before returning to work. *Id*., ¶¶ 18-19.

Plaintiff alleges that on January 12, 2018, she "filed a complaint of discrimination, retaliation and harassment with Ford's company hotline," but that Ford Labor Relations closed the complaint without taking any action. *Id*. ¶¶ 20-21. She says that on January 16, 2018, she had the fitness for duty examination with Dr. Douglas Mack at the Beacon Health Clinic. *Id*. ¶ 22. Plaintiff returned to work around February 17-18, and worked a full shift. The next work day, Ms. J. Huggins, a Ford supervisor, told Plaintiff that she must report to the Labor Relations department to get clearance to work. She states that when she did so, Pete Corrado yelled at her, told her she was fired, and called security to remove her from the plant. *Id*. ¶¶ 28-31.

In Count I of her complaint, Plaintiff alleges that Ford discriminated against her by falsely regarding her as disabled, and in retaliation for her "complaints of harassment,

---

10, *2017*.

discrimination and retaliation based on her perceived disability," *id*., PageID.6-8, PageID.36-50, in violation of the ADA,; in Count II, she brings analogous discrimination claim under the PWDCRA. *Id*., PageID.8-11, ¶¶ 51-65.

Appended to Defendant's motion as Exhibit A are excerpts from Plaintiff's deposition. Plaintiff testified that she was a temporary employee at Ford, who sometimes worked full-time and sometimes part-time. ECF No. 18-2, PageID.95. She stated that on January 4, 2018, she was called into the Labor Relations Department, where Ryan Hernandez told her that some of the workers "said sometimes I'm happy, sometimes I'm sad, sometimes I'm laughing, and I wanted to make their work environment seem hostile." *Id*. Plaintiff assumed that "Kelsey," one of the employees who she thought complained, was "a young lady that seemed to want to push equipment on the line at me and holler at me and just take things and try to act like she was going to hit me." *Id*. When asked why this person would do that, Plaintiff testified that "the only thing I can tell you is it must be something going on in their life that they must be unhappy. I believe everybody has something going on. I said but I don't have anything to do with it." *Id*. Plaintiff acknowledged that she was sometimes in Kelsey's work area. *Id*., PageID.97. Plaintiff did acknowledge that she probably called Kelsey "the B word." *Id*., PageID.105.

Plaintiff recounted an incident in 2017 when a supervisor pulled her off the line and told her that some other workers were complaining about her. *Id*., PageID.96. She opined that is was "some type of clique thing." *Id*. She also testified to an incident in August, 2017 when she was called in to Labor Relations regarding a text message she had sent to another employee. *Id*., PageID.98. Plaintiff conceded that she sent the text, but did not think that was something the employee should have complained about. *Id*, PageID.99.

Plaintiff was told that she could be fired because of the incident, but was instead suspended for one or two days, and then transferred from the paint shop to the assembly area. *Id*., PageID.100.

Plaintiff also testified that she believed a Juanita or Wynetta may have been another employee who complained about her. This was a person, Plaintiff said, who once told her to learn how to pick her battles. *Id*., PageID.96.

Plaintiff denied that she had behavior swings, or that she was fine one minute and agitated the next, or that she had conversations with herself or laughed out loud when nothing was occurring, and denied that there was a medical issue preventing her from performing her job. *Id*., PageID.104.  When questioned about Dr. Gelb's statement that she should not be in a work environment with other people until she gets successful treatment, Plaintiff stated, "I don't agree with any of that....Because, first of all, I don't need treatment." *Id*., PageID.108. She went on to testify that she did not agree with Dr. Gelb's treatment recommendations. *Id*., PageID.109.  She stated that when Dr. Mack told her that she needed to see another psychiatrist, she scheduled an appointment at a clinic, but said that afterward, "[a]nd then after I thought about it, this is ludicrous and I'm tired of this and I said I wasn't going." *Id*., PageID.111. Plaintiff acknowledged that Dr. Mack told her that she could not return to work if she did not see another psychiatrist. *Id*. She stated, "Like I said, I did refuse to go see another psychiatrist." *Id*. She acknowledged a report from Beacon Health stating that she "did not comply with recommendations, attitude resistant." *Id*.  Plaintiff stated that on February 19, Pete Corrado told her she was fired for "zero tolerance." *Id*. PageID.112.

Appended to Defendant's motion as Exhibit B is the declaration of Kevin Draeger, who was the Labor Relations Supervisor at Ford's Dearborn Truck Plant during

Plaintiff's employment there. He states that Plaintiff was a temporary or supplemental employee during the time she worked at Ford. ECF No. 18-3, PageID.130. He states that in January, 2018, two employees complained to Labor Relations about the Plaintiff's conduct. These employees spoke to Ryan Herndandez, who directly reports to Mr. Draeger, and signed written statements. *Id*. Mr. Draeger and Mr. Hernandez discussed the reports and the interviews, and according to the employees, Plaintiff exhibited unusual behavior, "including behavior swings, having aggressive outbursts, being confrontation prone, laughing at nothing, cursing at other employees, and repeatedly going in other employees' work areas on the assembly line." *Id*., PageID.131, ¶ 6. Mr. Draeger states that he felt this type of behavior could be related to a medical issue, and if so, Ford should "give her the opportunity to address the issue instead of terminate her employment." *Id*. ¶ 7. The union agreed, and it was decided that Plaintiff should be referred to the Employee Assistance Program for a fitness for duty evaluation, Mr. Draeger states, "If the fitness for duty evaluation showed there was a medical or mental health reason behind the behavior, she possibly could obtain treatment and then return to work. The alternative was immediate termination." *Id*.

Mr. Draeger goes on to state that Plaintiff was referred to Beacon Health, where she met with Douglas Mack, who determined what type of fitness for duty referral was appropriate. Beacon Health in turn referred Plaintiff to Richard Gelb, Ph.D, who met with Plaintiff on January 25, 2018. Dr. Gelb prepared a report finding that Plaintiff was not fit for duty, but indicated "that Ms. Tademy should begin meeting with a psychiatrist, take medications as prescribed, and begin psychotherapy once or twice a week for six to nine months, and, ant that point, she might be able to return to work." *Id*. ¶ 9. Plaintiff was advised that she must follow those recommendations before a return to work could be

discussed. *Id*.

Mr. Draeger states that Mr. Mack advised that Plaintiff refused to follow the treatment recommendations, so Mr. Draeger and Mr. Hernandez decided to terminate Plaintiff's employment. Mr. Draeger concludes, "Because she refused to follow the treatment recommendations, her violation of Ford's zero tolerance policy would not be excused. On February 19, 2018, Ms. Tademy was terminated for violating the zero tolerance policy....Her termination was due solely to her conduct. She was not terminated due to a disability or a perceived disability." *Id*. ¶ 10,

Appended to the Draeger declaration as Exhibit 1 are the written complaints of two employees regarding Plaintiff's behavior and Plaintiff's written responses, ECF No. 18-3, PageID.134-144. The first employee reported seeing Plaintiff "go off" on other people, by which she meant Plaintiff unleashing obscene tirades. This employee said, "She is a firecracker, and you never know what or who is going to make her pop." *Id*., PageID.134. The second employee wrote that Plaintiff often moved into her area and interfered with her work. On one occasion, this employee accidentally clipped Plaintiff with a bin. She states,

> "Five minutes later she [Plaintiff] came back over and started calling me a bitch. She called me a bitch at least 5 or 6 times. I apologized for accidentally hitting her with the bin. She kept repeating that she is not in my area and that is not my area. She keeps pushing my machines out of the way to get to her part and she is not following the OIS sheet. If she was following the OIS she would not be in my area. Donald Church addressed her about it. This is an everyday thing. She is constantly trying to work ahead in my area.
>
> "Prior to shutdown I was working the interface plate and I had to manally fix it, when I went to go fix it, she walked around me and was standing waiting for the next truck. She had the rail under her arm for the next truck, I gave myself plenty of room to walk around the rail and the next thing I know I was tripping over the rail. I believe she purposely tried to trip me and started laughing about it.

> "We started off on my job and they moved her next to me. She kept coming in my area and I nicely asked her several times to stay out of my area. I went to go reload my interface plate and she was in my area and struck my hand and I said you need to seriously stay out of my area. At that point she went off, she said she was not in my area and I said you need to stay out of my area. She told me that I needed to move my machine and I told her I didn't because it is not her area. She said she can do what she wants, and then she continued to keep pushing my machine out of the way until Steve Hughes came over and moved her out of my area.
>
> :She cursed at me, she said, 'I am not in your fucking area.' I walked away from her I don't like confrontation. I feel like she is trying to intimidate me.___heard her calling me a bitch. That is all I know about what ___heard." *Id.*, PageID.136-137.

Exhibit 2 is Ford's Anti-Harassment-Zero Tolerance Policy Directive. *Id.*, PageID.145-147. The Policy states that "[e]mployees who violate this Directive will be subject to discipline up to and including termination, even for the first violation." *Id.*, PageID.146.

Exhibit 3 to the Declaration is Ford's referral form for the fitness for duty evaluation. In describing the precipitating incident, the form states,

> "Extreme behavior with co-workers. Fine one minute, highly agitated the next. Has conversations with herself and laughs out loud when nothin is occurring. Concerns that she is unfit for manufacturing floor or may cause an unsafe work environment. Concern that a medical issue may be preventing her from performing to her capabilities physically and emotionally." *Id.*, PageID.151.

Exhibit 4 to the Declaration is Dr. Gelb's written evaluation, in which he concludes, "Based on all the data available as summarized and analyzed below, it is this evaluator's opinion within a reasonable degree of clinical probability that the employee is unfit for duty." *Id.*, PageID.154. Dr. Gelb opined that Plaintiff could not perform her essential job functions, adding that he "cannot think of any modifications that would help given her psychological condition and job responsibilities." *Id.*, PageID.156. In answer to the question of what treatment recommendations Plaintiff would have to complete "prior

to and/or during return to work," Dr. Gelb recommended the treatment as set forth in ¶ 9 of Mr. Daeger's Declaration. *Id*., PageID.156-157.

Exhibit 5 to the Daeger Declaration is Plaintiff's termination form, which indicates, "Term for zero tolerance violation." *Id*., PageID.159.

Plaintiff filed her own Declaration in response to Defendant's motion [ECF No. 23, PageID.166-170. She states that her co-workers "filed several false complaints about the Plaintiff's behavior towards them in January 2018. Plaintiff's co-workers complaints were the behaviors that the Plaintiff's co-workers did towards the Plaintiff." *Id*., PageID.166. Plaintiff concedes that she "didn't comply with the recommendations of the IME and the Plaintiff was terminated several times falsely and was not due to her violation of Zero Tolerance Policy." *Id*., PageID.167. She states that her "conduct never violated Ford's Zero Tolerance Policy, and Ford should not have decided to refer Plaintiff to its Employee Assistant Program instead of terminating the Plaintiff." *Id*.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Entry of summary

judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment is proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III. DISCUSSION

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA further defines "disability" as (i) "a physical or mental impairment that substantially limits one or more major life activities," (ii) "a record of such an impairment," or (iii) "being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1)(A)-( C ). In this case, Plaintiff relies on the "regarded as" definition of disability.

Likewise, Michigan's PWDCRA defines "disability" as:

"(i) A determinable physical or mental characteristic of an individual which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

(A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's **406 ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion."

(iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i)."  M.C.L. § 37.1103(d).[2]

To establish a prima facie case of disability discrimination under the ADA, "a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011) (internal quotation marks omitted). "Furthermore, the disability must be a 'but for' cause of the adverse employment action." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016)(citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc)).

In this case, Plaintiff was fired, so she clearly suffered an adverse employment decision. However, she has failed to show that she is "disabled" within the meaning of the ADA or the PWDCRA, and has not shown that she is "otherwise qualified" for the

---

[2] Because the ADA and the PWDCRA "share the same purpose and use similar definitions and analyses," both the Michigan Supreme Court and the Michigan Court of Appeals "have relied on the ADA in interpreting the PWDCRA." *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 472, 606 N.W.2d 398, 405 (1999). My analysis of the Plaintiff's ADA claim is therefore applicable to her PWDCRA claim.

position.

As framed in her complaint, Plaintiff claims discrimination based on the "regarded as" definition of disability under 42 U.S.C. § 12102(1)( C ). However, the only evidence that Plaintiff relies on to show that she was "regarded as" being disabled is Ford's decision to send her for a IME, or fitness for duty examination, because her superiors opined that the reports of her disruptive behavior might be related to a psychological or medical problem. While that proposition has some intuitive appeal, it is not consistent with Sixth Circuit case law. In *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th Cir. 1999), the plaintiff argued that the defendant regarded him as disabled because he was "asked...to undergo mental and physical examinations to determine his fitness as a teacher following his allegedly exhibiting some unusual behavior." *Id*. at 810. In rejecting that argument, the Sixth Circuit held:

> "Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, this is not enough to suggest that the employee is regarded as mentally disabled. As the district court ably explained, a defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Id*.

*Sullivan* quoted with approval *Cody v. CIGNA Healthcare of St. Louis, Inc*., 139 F.3d 595, 599 (8th Cir.1998), where the Eighth Circuit stated:

> "An employer's request for a mental evaluation is not inappropriate if it is not obvious that an employee suffers from a disability. A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)( C ).'

Furthermore, an employer may properly refer an employee for a medical or psychological examination where the employer "had a reasonable basis for believing that [the employee] was unable to perform the essential functions of her job or that she posed

-11-

a direct threat to her own safety or the safety of others." *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 624 (6th Cir.2014) (internal citations omitted).[3] That was precisely the situation in the present case. Ford had complaints from two employees that the Plaintiff was not only behaving in an unusual way, but that her conduct was disruptive and possibly posed a threat to the safety of her work area. She had been previously disciplined. Indeed, the alleged behavior was a violation of Ford's Anti-Harassment Zero Tolerance Policy. As Mr. Draeger states in his Declaration, Plaintiff could have been fired, but he thought Plaintiff's behavior could be related to a medical issue, and if so, Ford should "give her the opportunity to address the issue instead of terminate her employment." ECF No. 18-3, PageID.131.

Therefore, Plaintiff fails the first prong of a prima facie case under the ADA–she has not shown that Ford regarded her as disabled.

Plaintiff also fails the second prong, because based on Dr. Gelb's report, she was not "otherwise qualified," that is, she could not perform the essential functions of her job. Again, Dr. Gelb wrote that "[b]ased on all the data available as summarized and analyzed below, it is this evaluator's opinion within a reasonable degree of clinical probability that the employee is unfit for duty." ECF No. 18-3, PageID.154. Dr. Gelb opined that Plaintiff could not perform her essential job functions, adding that he "cannot think of any modifications that would help given her psychological condition and job responsibilities." *Id.*, PageID.156.

In addition, under the "regarded as" prong of the ADA, the perceived disability must be the "but for" cause of the adverse employment action. *Tennial*, 840 F.3d at 306

---

[3] An otherwise justified referral for a medical or psychological evaluation is not considered an adverse employment action. *Sullivan*, 197 F.3d at 813.

(citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc)). Here, apart from the fact that Plaintiff has not shown a perceived disability or that she was otherwise qualified for her job, her firing was based on the independent ground of violation of the Zero Tolerance Policy. As Mr. Draeger stated in his Declaration, Ford could have fired Plaintiff at the outset, without referring her for the IME. In any event, such violations have been held to valid, non-discriminatory reasons for terminations. *See, e.g., Gribcheck v. Runyon*, 245 F.3d 547, 552 (6th Cir. 2001) (employee's violation of Post Office's zero tolerance policy, which encompassed the use of foul language, was a non-discriminatory reason for his firing).

And even if we assume that Plaintiff was fired for not complying with Dr. Gelb's treatment recommendations, that would not have constituted a disability based discriminatory action. In *Sullivan*, 197 F.3d at 813, the Sixth Circuit held:

> "But an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination. And while the district's subsequent suspending of Sullivan is an adverse job action, it was based on his refusal to undergo the valid examinations, which is not a discriminatory reason."

*See also Zulueta v. United States*, 2009 WL 1651172, at *9 (M.D. Tenn. June 10, 2009)(employer's good-faith reliance on a psychological evaluation concluding that plaintiff was not fit for duty is not discriminatory, "[e]ven if the medical opinions were demonstrably flawed".).

### IV. CONCLUSION

I recommend that Defendant's motion for summary judgment [ECF No. 18] be GRANTED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D.

Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 5, 2021

s/R. Steven Whalen
R. Steven Whalen
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on March 5, 2021 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager